UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X Case No.: 2:25-cv-3924
ELIZABETH HOESTEN,

Plaintiff,

COMPLAINT

-against-

ACCESS CLINICAL PARTNERS, LLC d/b/a GOHEALTH URGENT CARE, IRENE HOLDEN, *Individually*, and NATALIE FLEISHER, *Individually*,

PLAINTIFF DEMANDS A TRIAL BY JURY

Defendants.
-----------------------------------------------------------------X

Plaintiff, by way of Plaintiff's attorneys, PHILLIPS & ASSOCIATES, ATTORNEYS AT LAW, PLLC, hereby complains of the Defendants, upon information and belief, as follows:

**Nature of the Case**

1. This case involves an employee who complained to Defendant ACCESS CLINICAL PARTNERS, LLC d/b/a GOHEALTH URGENT CARE of intentionally misclassifying her position so that she would not receive overtime pay. In addition, shortly after Plaintiff complained of her misclassification, Plaintiff began to be retaliated against by Defendants, resulting in her unlawful termination.

2. Plaintiff complains pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207 (a)(1), and the New York Labor Law ("NYLL") Article 19, for failure to pay overtime wages and spread of hours.

3. Plaintiff also complains pursuant to the NYLL § 740 (2)(a)-(c), for retaliation due to her complaints of misclassification and failure to pay overtime wages.

**Jurisdiction and Venue**

4. Jurisdiction of this Court is proper under 29 U.S.C. §216 (b) and 28 U.S.C. §§ 1331 and 1343.

5. This Court has supplemental jurisdiction over Plaintiff's claims brought under state law pursuant to 28 U.S.C. § 1367.

6. Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b), based upon the fact that the claims alleged herein took place within the Eastern District of New York.

**Parties**

7. Plaintiff is a resident of Suffolk County, State of New York.

8. At all times material, Defendant ACCESS CLINICAL PARTNERS, LLC d/b/a GOHEALTH URGENT CARE ("GOHEALTH") was and is a foreign limited liability company organized pursuant to the laws of the State of Delaware and duly operating in and under the laws of the State of New York.

9. Defendant GOHEALTH's principal place of business is 5555 Glenridge Connector, Suite 700, Atlanta, GA 30342.

10. At all times material, Defendant GOHEALTH owned and operated four urgent care facilities which were all located within the State of New York, specifically located in the cities of Port Jefferson Station, Lake Grove, Smithtown, and Commack.

11. Defendant GOHEALTH constitutes an enterprise within the meaning of the FLSA, 29 U.S.C. § 203(r-s).

12. At all times relevant to this action, Defendant GOHEALTH has been engaged in commerce or in an industry or activity affecting commerce.

13. At all times material, Defendant GOHEALTH was Plaintiff's employer under the FLSA.

14. At all times material, Defendant GOHEALTH was Plaintiff's employer under the FLSA.

15. At all times material, Defendant GOHEALTH was Plaintiff's employer under the NYLL.

16. At all times material hereto, Defendant IRENE HOLDEN ("HOLDEN") was and is an employee of Defendant GOHEALTH, holding the position of Director of Operations.

17. At all times material, Defendant HOLDEN had the authority to hire, promote, terminate, and affect the terms and conditions of Plaintiff's employment or to otherwise influence the decision making regarding same.

18. At all times material, Defendant HOLDEN was Plaintiff's supervisor and/or had supervisory authority over Plaintiff.

19. At all times material, Defendant HOLDEN was Plaintiff's employer under the FLSA.

20. At all times material, Defendant HOLDEN was Plaintiff's employer under the NYLL.

21. At all times material hereto, Defendant NATALIE FLEISHER ("FLEISHER") was and is an employee of Defendant GOHEALTH, holding the position of Director of Human Resources ("HR").

22. At all times material, Defendant FLEISHER had the authority to hire, promote, terminate, and affect the terms and conditions of Plaintiff's employment or to otherwise influence the decision making regarding same.

23. At all times material, Defendant FLEISHER was Plaintiff's supervisor and/or had supervisory authority over Plaintiff.

24. At all times material, Defendant FLEISHER was Plaintiff's employer under the FLSA.

25. At all times material, Defendant FLEISHER was Plaintiff's employer under the NYLL.

26. Defendant GOHEALTH, Defendant HOLDEN, and Defendant FLEISHER, at times, will be referred to herein collectively as "Defendants."

27. The FLSA defines "employer" to include any person acting directly or indirectly in the interest of an employer in relation to an employee and an employee is anyone who is suffered or permitted to work. As a result, including as further described below, all Defendants are liable as "employers" under the FLSA.

28. Upon information and belief, Defendant GOHEALTH grossed more than $500,000 in the past fiscal year, and further, during Plaintiff's employment by Defendant GOHEALTH, she routinely engaged in activities which facilitated or related to interstate or foreign commerce while on the job.

**Material Facts**

29. On or around April 22, 2024, Plaintiff was hired by Defendant GOHEALTH as an on-site manager.

30. Plaintiff's annual salary was approximately $90,000 annually (or approximately $45 per hour).

31. At the time of hire, Plaintiff was informed by Aishah Saunders ("Saunders"), Defendants' HR manager, that Plaintiff would be scheduled for approximately 36 to 48 hours per week.

32. The duties and responsibilities of an on-site manager included, but were not limited to, overseeing approximately 40 employees with cost management responsibilities; monitoring Net Promoter Scores ("NPS") and implementing measures to address patient satisfaction and customer service issues; managing the scheduling of the front desk, scribes, medical assistants, and x-ray technicians; monitoring patient flow and overseeing front and back-office operations; supervising, coaching, evaluating, and mentoring employees, including conducting performance reviews; addressing performance issues and disciplining employees (including, but not limited to, writing employees up and/or terminating employees); conducting staff meetings and training sessions; ensuring patient confidentiality in accordance with HIPAA and company policies; inspecting facilities daily for structural, cosmetic, or operational issues; reconciling daily payment collections; ensuring staff productivity and professionalism during all working hours; maintaining office and medical supply inventory; facilitating the deployment of new testing

technologies and training staff accordingly; coordinating with vendors and external departments, including radiology and call centers; performing HIPAA walk-throughs and inspections; managing processes with external vendors, such as supply distributors and call centers.

33. Upon information and belief, many of the items and vendors utilized by Defendant GOHEALTH originated from outside the State of New York.

34. Once Plaintiff began working, it became clear that her actual responsibilities significantly differed from what she was informed would be her duties during the interview process.

35. Upon information and belief, immediately before Plaintiff began working as an on-site manager, GOHEALTH offered the exact same position as a non-exempt position which provided overtime.

36. Instead of the managerial tasks that Plaintiff was informed she would be handling, Plaintiff spent a majority of her time at the front desk of her site, covering staffing shortages, and traveling between centers (Port Jefferson Station, Lake Grove, Smithtown, and Commack) to pick up and drop off supplies due to late or missing supply orders.

37. These additional non-managerial duties caused Plaintiff to work incredibly long hours for which she did not receive any additional compensation.

38. Plaintiff spent most of her time completing work duties that her non-exempt co-workers completed and for which they received overtime pay.

39. Additionally, key managerial roles, that Plaintiff was informed she would have authority over, were actually completed by other employees.

40. For example, Plaintiff was also not responsible for monitoring NPSs, as this was handled by the Operations Specialist, Rosa Dragonetti ("Dragonetti").

41. Along the same lines, despite being told she would oversee cost management, Plaintiff had no authority in this area.

42. Indeed, whenever Plaintiff inquired about her site's budget for supply ordering, she was required to have her budget approved by Defendant HOLDEN.

43. Whenever Plaintiff attempted to order supplies, she was required to follow a strict process: employees updated an Excel spreadsheet with required items, Plaintiff then submitted the request, and Defendant HOLDEN determined whether to approve or deny it.

44. On multiple occasions, Plaintiff's site ran out of essential supplies due to delays in approval from Defendant HOLDEN and Rachel Miller ("Miller"), Defendants' executive director, despite the fact that Plaintiff had correctly submitted the request.

45. Furthermore, Plaintiff was informed that she would have authority over the creation of the schedule for her site, but this did not actually occur. Any scheduling, PTO approvals, and timecard management tasks were handled by Dragonetti.

46. On or around May 6, 2024, Plaintiff was instructed that she would be responsible for four site locations.

47. Plaintiff regularly worked approximately between the hours of 8:00 AM and 8:00 PM.

48. Additionally, if Plaintiff was on call, she would have to work until approximately 12:00 AM.

49. However, team members were permitted to begin calling out of shifts two hours prior to 8:00 AM, so Plaintiff was required to be available at 6:00 AM to respond to call outs and prepare coverage for employees.

50. Furthermore, despite the fact that Plaintiff's site locations closed at 8:00 PM, team members would contact Plaintiff outside of operating hours to discuss work matters and scheduling issues.

51. Plaintiff was also responsible for being on-call certain weekend, which required her to be available 24 hours per day.

52. As such, Plaintiff was required to work far in excess of forty (40) hours per week.

53. During the week of May 5, 2024, Plaintiff worked approximately 89 hours.

54. During the week of May 12, 2024, Plaintiff worked approximately 103 hours.

55. During the week of May 19, 2024, Plaintiff worked approximately 91 hours.

56. On or around May 31, 2024, Miller contacted Plaintiff to discuss Plaintiff's on-call schedule.

57. During this meeting, Plaintiff complained that she had been working excessive hours without adequate compensation, which surpassed the hours she was originally instructed that she would be working.

58. Miller dismissed Plaintiff's complaint and appeared to act as if Plaintiff's concerns were irrelevant.

59. Specifically, Miller stated, in sum and substance, that Plaintiff was still new, needed to settle into her role, and should set boundaries with staff.

60. During the week of May 26, 2024, Plaintiff worked approximately 61 hours.

61. In or around May 2024, Plaintiff was prevented from disciplining subordinates for policy violations, despite the fact that disciplining subordinates was supposed to be a managerial authority.

62. Specifically, an employee ("Employee #1") repeatedly showed up to work in violation of the dress code.

63. After issuing a verbal warning and even sending this employee home early from a shift for refusing to wear the company-provided uniform, Plaintiff then consulted Lynn Darmstadt ("Darmstadt"), one of Defendants' HR representatives, about escalating the matter to a written warning.

64. Despite this being a habitual issue with Employee #1, Darmstadt prohibited Plaintiff from escalating the discipline.

65. Additionally, in or around May 2024, another employee ("Employee #2") repeatedly violated the company's attendance policy with habitual unplanned absences and late arrivals, which directly impacted patient care.

66. Due to the lean staffing model, Employee #2's tardiness frequently left the site without any clinical staff except the provider and a receptionist (who was not trained for hands-on patient care).

67. Plaintiff requested that Dragonetti pull Employee #2's timecard history, which confirmed multiple policy violations.

68. Plaintiff then presented this information to Darmstadt and requested permission to issue a formal write-up.

69. Again, Plaintiff was again denied the ability to discipline a subordinate, with no explanation.

70. During the week of June 2, 2024, Plaintiff worked approximately 70 hours.

71. During the week of June 9, 2024, Plaintiff worked approximately 93 hours.

72. On or around June 17, 2024, Plaintiff, mentally and physically exhausted after continually working 60-hours weeks, emailed Defendant HOLDEN and requested to take a mental health day on June 18, 2024.

73. Plaintiff felt extremely frustrated and depressed by the excessive number of hours she worked without overtime compensation.

74. Soon thereafter, Plaintiff received a call from Defendant HOLDEN who denied Plaintiff's request, again reiterating that she was new and would "get used to it."

75. During the week of June 16, 2024, Plaintiff worked approximately 90 hours.

76. On or around June 24, 2024, Defendant HOLDEN instructed Plaintiff to "conduct inventory" by June 28, 2024.

77. Conducting inventory consisted of traveling to four of the locations for which Plaintiff was responsible, counting their inventory of supplies such as, but not limited to, medications, bandages, sutures, and other clinical supplies.

78. Plaintiff was then required to enter the inventory information into Defendants' system.

79. Conducting inventory took approximately six to eight hours per location.

80. On or around June 27, 2024, Plaintiff, after conducting inventory for two of her locations over the course of 15 hours, emailed Defendant HOLDEN that, in sum and substance, Plaintiff was "burnt out" and "spread thin."

81. On or around June 28, 2024, Plaintiff emailed Defendant HOLDEN and Darmstadt to complain about a number of concerns, including that she had been required to work approximately 14-15 hours per day, 5 to 6 days per week.

82. Later on, the same day, Plaintiff met with Defendant HOLDEN and Darmstadt to discuss Plaintiff's concerns.

83. During the meeting, Plaintiff specifically complained that she was working excessive hours and was "burnt out."

84. Plaintiff also complained that when she was hired, she asked Saunders how many hours she would be working and was informed that she would be working only approximately 38-46 hours per week.

85. Plaintiff articulated that in actuality she had been working more than 14 hours per day.

86. Defendant HOLDEN responded, in sum and substance, that Plaintiff needed to evaluate how her day was scheduled because this was a "learning experience."

87. At the end of the meeting, Plaintiff reiterated that the number of hours she had been working affected her mental and physical health.

88. Darmstadt and Defendant HOLDEN stated, in sum and substance, that they wanted to support Plaintiff and would follow up with her regarding how to move forward.

89. During the week of June 23, 2024, Plaintiff worked approximately 76 hours.

90. On or around June 30, 2024, Plaintiff emailed Darmstadt a document which illustrated Plaintiff's typical day, including hours she worked, and tasks that she was forced to complete but were not her responsibilities.

91. In or around June 2024, Plaintiff was again prevented from disciplining a subordinate for policy violations, despite the fact that disciplining subordinates was supposed to be a managerial authority.

92. In this instance, Employee #2 no-called/no-showed for a scheduled shift, again leaving the site unable to provide adequate patient care.

93. After she eventually returned Plaintiff's call, hours after her shift had begun, Plaintiff escalated the matter to Darmstadt, requesting a formal write-up or termination per company policy.

94. Defendants' policy explicitly requires employees to notify management before the start of their shift if they are unable to work their shift.

95. Again, Darmstadt refused to allow Plaintiff to discipline Employee #2, arguing that because Employee #2 eventually called back, the policy did not apply.

96. Plaintiff then read the policy to Darmstadt verbatim and expressed her concerns, but her request for disciplinary action was again denied.

97. Plaintiff then spoke with Defendant HOLDEN, who agreed that disciplinary action was warranted and that Darmstadt's decision was incorrect.

98. However, no further action was taken, and the issue was never addressed.

99. On or around July 1, 2024, Darmstadt requested, in sum and substance, to share the document with Defendant HOLDEN and Miller, to which Plaintiff agreed.

100. Later that day, Plaintiff received a call from Lisseth Castillo ("Castillo"), one of Plaintiff's co-workers, who informed Plaintiff, in sum and substance, that on or around June 28, 2024, Darmstadt held an impromptu meeting with Castillo during which Darmstadt questioned her regarding Plaintiff's performance.

101. On this same day, Plaintiff received an email from Defendant HOLDEN requesting a meeting.

102. Plaintiff, concerned about the substance of the meeting, declined the meeting invitation as she wanted to first speak with HR regarding her concerns.

103. Plaintiff contacted Saunders and stated, in sum and substance, that she wanted to meet with Saunders prior to meeting with Defendant HOLDEN.

104. Saunders confirmed that it was acceptable to meet with Defendant HOLDEN on a later date.

105. On or around July 2, 2024, Plaintiff virtually met with Darmstadt and Saunders to discuss Plaintiff's concerns.

106. During the meeting, Plaintiff asked if Defendant FLEISHER was aware of Plaintiff's complaints, to which they responded in the affirmative.

107. During the meeting, Plaintiff stated that she felt her position was being misclassified and Saunders had misrepresented the amount of hours Plaintiff would be required to work.

108. Saunders denied that she had informed Plaintiff that she would work less than 40 hours.

109. During the meeting, Saunders also stated, in sum and substance, that Plaintiff was an exempt employee who could not receive overtime pay.

110. Plaintiff responded that, in sum and substance, she believed she was not exempt, and Defendants had actually misclassified her position.

111. At the end of the meeting, Plaintiff reiterated her complaint that her position had been misclassified, that she was owed overtime pay, and she asked whether she could elevate her complaint.

112. Darmstadt stated, in sum and substance, that Plaintiff could contact Defendant FLEISHER if she wished.

113. Plaintiff's complaint was made in good faith and was based on a reasonable belief that Defendants' actions were in violation of a law, rule or regulation.

114. At no time during this conversation was Plaintiff informed that there was an open investigation concerning Plaintiff's performance due to alleged team member complaints.

115. After the meeting, Plaintiff emailed Defendant FLEISHER, Andrew Biga, Defendants' Head of HR, and Rachael Zichella, an attorney in Defendants' legal department, to complain, in pertinent part, that she would like to discuss her hourly rate and classification because she believed she was being misclassified.

116. Additionally, Plaintiff requested to discuss her past hourly wages and the future alignment of her salary, working hours, and responsibilities.

117. Defendant FLEISHER responded, in sum and substance, that she was unaware of Plaintiff's situation, and scheduled a meeting for July 3, 2024.

118. Plaintiff was extremely surprised to hear that Defendant FLEISHER was unaware of Plaintiff's complaints as Darmstadt and Saunders had represented to Plaintiff, in sum and substance, that Defendant FLEISHER was informed of Plaintiff's complaints.

119. On or around July 3, 2024, Plaintiff virtually met with Defendant FLEISHER.

120. Plaintiff was informed by Defendant FLEISHER, in sum and substance, that there was an open investigation pertaining to Plaintiff's performance, which was why Plaintiff's team members had been contacted.

121. Until the aforementioned conversation, Plaintiff was never informed that her performance was under investigation or that she had any performance issues.

122. During this call, Plaintiff complained to Defendant FLEISHER, in sum and substance, that she was a misclassified employee and was had not been properly compensated for working over 80 hours, bi-weekly.

123. Plaintiff's complaint was made in good faith and was based on a reasonable belief that Defendants' actions were in violation of a law, rule or regulation.

124. Defendant FLEISHER did not respond.

125. Plaintiff then requested that Defendants' conduct an investigation into her misclassification and corrected compensation.

126. Defendant FLEISHER responded, in sum and substance, that she would conduct an investigation into her complaints and would contact Plaintiff.

127. On or around July 4, 2024, Plaintiff had another virtual meeting with Defendant FLEISHER.

128. Defendant FLEISHER informed Plaintiff, in sum and substance, that the purpose of the call was to discuss complaints against Plaintiff.

129. Plaintiff was surprised and felt that she was being targeted for her prior complaints.

130. Defendant FLEISHER questioned Plaintiff about alleged complaints from Plaintiff's team members that Plaintiff was unprofessional and disrespectful to them.

131. Plaintiff had previously brought each of the aforementioned issues to Defendant HOLDEN's attention but Defendants had never informed Plaintiff that these matters reflected negatively on Plaintiff's performance.

132. Plaintiff vehemently denied that she had done anything improper in addressing her team members in relation to each of the incidents mentioned by Defendant FLEISHER.

133. Plaintiff stated, in sum and substance, that she could provide Defendant FLEISHER with text messages between her and two of the team members that allegedly made a complaint against her to further prove she did not participate in misconduct.

134. Plaintiff then began to reiterate the fact that she had been working extraordinary hours without earning overtime pay and the toll, both physical and mental, it had taken on her.

135. Plaintiff stated, in sum and substance, that due to her extreme number of working hours, she had to begin to undergo counseling, felt burnt out, suffered mental and emotional distress, had suicidal ideation, and lost approximately 15 pounds since she began working for Defendants.

136. Plaintiff then stated, in sum and substance, that she believed the investigation into her performance was in retaliation for her complaints of her misclassification.

137. Plaintiff's complaint was made in good faith and was based on a reasonable belief that Defendants' actions were in violation of a law, rule or regulation.

138. At the end of the conversation, Plaintiff felt distraught over the alleged complaints against her, as well as the fact that she was being retaliated against for her complaint regarding being misclassified and began to cry.

139. Plaintiff requested to take a mental health day and not work for the remainder of the day.

140. Defendant FLEISHER approved Plaintiff's request and the meeting ended.

141. On or around July 5, 2024, Plaintiff virtually met with Defendant HOLDEN and Defendant FLEISHER.

142. Defendant HOLDEN stated, in sum and substance, "the decision [had] been made to terminate [her] employment, effective today."

143. Plaintiff requested a reason for her termination, to which Defendant FLEISHER responded, in sum and substance "It's not working out."

144. Defendant HOLDEN and Defendant FLEISHER then ended the virtual meeting, after less than two minutes.

145. Plaintiff was not informed of the outcome of her complaints.

146. Additionally, at her time of hire, Plaintiff was informed by Defendant HOLDEN that all On-Site Managers would receive training on Tableau, an essential application used to track and manage site and employee metrics.

147. Despite multiple requests, no formal training was provided to Plaintiff.

148. This tool was crucial for Plaintiff to conduct her supposed supervisory responsibilities.

149. It was not until July 5, 2024, the same day Plaintiff was terminated, that she was finally given a brief training via Teams from Defendant HOLDEN and Miller.

150. During the week of June 30, 2024, Plaintiff worked approximately 70 hours.

151. Throughout Plaintiff's employment, Plaintiff's bi-weekly paystubs only ever reflected that Plaintiff had worked 40 hours per week.

152. However, every week between May 5, 2024, and June 30, 2024, Plaintiff worked more than 40 hours per week.

153. Although Defendants were aware Plaintiff worked hours significantly over 40, Defendants did not properly pay Plaintiff overtime or spread of hours. Instead, Defendant willfully and improperly paid Plaintiff a salary of approximately $90,000.00 which did not include any overtime premium or spread of hours pay.

154. During the week of April 21, 2024, Plaintiff's spread of hours exceeded ten hours on two days.

155. Accordingly, Defendants failed to pay Plaintiff $33.00 (2 days x $16.50 = $33.00) for the week of April 21, 2024.

156. During the week of May 5, 2024, Plaintiff worked 49.23 hours of overtime.

157. Accordingly, Defendants failed to pay Plaintiff $3,195.03 (49.23 hours x $64.90 = $3,195.03) for the week of May 5, 2024.

158. During the week of May 5, 2024, Plaintiff's spread of hours exceeded ten hours on six days.

159. Accordingly, Defendants failed to pay Plaintiff $99.00 (6 days x $16.50 = $99.00) for the week of May 5, 2024.

160. During the week of May 12, 2024, Plaintiff worked 63.02 hours of overtime.

161. Accordingly, Defendants failed to pay Plaintiff $4,090.00 (63.02 hours x $64.90 = $4,090.00) for the week of May 12, 2024.

162. During the week of May 12, 2024, Plaintiff's spread of hours exceeded ten hours on seven days.

163. Accordingly, Defendants failed to pay Plaintiff $115.50 (7 days x $16.50 = $115.50) for the week of May 12, 2024.

164. During the week of May 19, 2024, Plaintiff worked 51.7 hours of overtime.

165. Accordingly, Defendants failed to pay Plaintiff $3,355.33 (51.7 hours x $64.90 = $3,355.33) for the week of May 19, 2024.

166. During the week of May 19, 2024, Plaintiff's spread of hours exceeded ten hours on six days.

167. Accordingly, Defendants failed to pay Plaintiff $99.00 (6 days x $16.50 = $99.00) for the week of May 19, 2024.

168. During the week of May 26, 2024, Plaintiff worked 21.1 hours of overtime.

169. Accordingly, Defendants failed to pay Plaintiff $1,369.39 (21.1 hours x $64.90 = $1,369.39) for the week of May 26, 2024.

170. During the week of May 26, 2024, Plaintiff's spread of hours exceeded ten hours on five days.

171. Accordingly, Defendants failed to pay Plaintiff $82.50 (5 days x $16.50 = $82.50) for the week of May 26, 2024.

172. During the week of June 2, 2024, Plaintiff worked 30.9 hours of overtime.

173. Accordingly, Defendants failed to pay Plaintiff $2,005.41 (30.9 hours x $64.90 = $2,005.41) for the week of June 2, 2024.

174. During the week of June 2, 2024, Plaintiff's spread of hours exceeded ten hours on five days.

175. Accordingly, Defendants failed to pay Plaintiff $82.50 (5 days x $16.50 = $82.50) for the week of June 2, 2024.

176. During the week of June 9, 2024, Plaintiff worked 53.77 hours of overtime.

177. Accordingly, Defendants failed to pay Plaintiff $3,489.67 (53.77 x $64.90 = $3,489.67) for the week of June 9, 2024.

178. During the week of June 9, 2024, Plaintiff's spread of hours exceeded ten hours on six days.

179. Accordingly, Defendants failed to pay Plaintiff $99.00 (6 days x $16.50 = $99.00) for the week of June 9, 2024.

180. During the week of June 16, 2024, Plaintiff worked 50.27 hours of overtime.

181. Accordingly, Defendants failed to pay Plaintiff $3,262.52 (50.27 hours x $64.90 = $3,262.52) for the week of June 16, 2024.

182. During the week of June 16, 2024, Plaintiff's spread of hours exceeded ten hours on five days.

183. Accordingly, Defendants failed to pay Plaintiff $82.50 (5 days x $16.50 = $82.50) for the week of June 16, 2024.

184. During the week of June 23, 2024, Plaintiff worked 36.3 hours of overtime.

185. Accordingly, Defendants failed to pay Plaintiff $2,355.87 (36.3 hours x $64.90 = $2,355.87) for the week of June 23, 2024.

186. During the week of June 23, 2024, Plaintiff's spread of hours exceeded ten hours on five days.

187. Accordingly, Defendants failed to pay Plaintiff $82.50 (5 days x $16.50 = $82.50) for the week of June 23, 2024.

188. During the week of July 1, 2024, Plaintiff worked 29.98 hours of overtime.

189. Accordingly, Defendants failed to pay Plaintiff $1,945.70 (29.98 hours x $64.90 = $1,945.70) for the week of July 1, 2024.

190. During the week of July 1, 2024, Plaintiff's spread of hours exceeded ten hours on four days.

191. Accordingly, Defendants failed to pay Plaintiff $66.00 (4 days x $16.50 = $66.00) for the week of July 1, 2024.

192. In total, Defendants failed to pay Plaintiff $25,068.92 in overtime pay and $841.50 in spread of hours pay.

193. Thus, Plaintiff is owed a total of **$25,910.42** ($25,068.92 + $841.50) for the time period of April 22, 2024, to July 5, 2024.

194. Plaintiff did not receive a set schedule of her working hours.

195. Plaintiff repeatedly asked her managers what her scheduled hours were supposed to be but never received an answer.

196. Defendants' reasons for termination are pretextual and made in retaliation for Plaintiff's protected activities.

197. There is a close temporal proximity between Plaintiff's complaints of misclassification and Defendants' retaliatory action.

198. Plaintiff was repulsed, offended, disturbed, humiliated, and disgusted by this blatantly unlawful retaliation for participating in protected activity.

199. Plaintiff experienced significant emotional distress from the actions and treatment described above.

200. While working for Defendants, Plaintiff became increasingly depressed.

201. During her employment and due to her emotional distress, Plaintiff was informed by Darmstadt to contact Defendants' mental health line after Plaintiff disclosed how severely negative her emotional status had become.

202. During her employment with Defendants, Plaintiff had suicidal ideations due to the difficult working conditions.

203. Defendants treated Plaintiff this way solely due to Plaintiff's participation in protected activity, specifically her complaints that Defendants misclassified her position and that Defendants unlawfully failed to adequately compensate Plaintiff with overtime pay.

204. But for Defendants' misclassification of Plaintiff's position, Plaintiff would have been paid hourly rates of one and one-half times the regular rate of pay for each hour worked in excess of forty hours in a work week.

205. But for Defendants' misclassification of Plaintiff's position, Plaintiff would have been paid an extra hour's wage for any day when the Plaintiff's spread of hours exceeded 10 hours.

206. Defendants acted intentionally and intended to harm Plaintiff.

207. Defendants unlawfully harassed, humiliated, degraded, and belittled Plaintiff. As a result, Plaintiff suffers loss of rights, emotional distress, and loss of income.

208. Plaintiff's performance was above average and satisfactory while working for Defendants.

209. Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

210. Defendants acted maliciously, willfully, outrageously, and with full knowledge of the law.

211. As such, Plaintiff demands punitive damages as against all Defendants, jointly and severally.

**First Cause of Action for Violation of Overtime Wage Provisions Under the FLSA**

212. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

213. Defendants willfully employed Plaintiff for work weeks longer than forty (40) hours and failed to compensate Plaintiff for her employment in excess of forty (40) hours per week, at a rate of at least one and one-half (1.5) times the rate at which she was employed.

214. Defendants failed to pay overtime wages to Plaintiff as required by the FLSA, 29 U.S.C. § 201 *et seq*. and its implementing regulations.

215. Defendants' failure to pay Plaintiff overtime pay in accordance with the FLSA, was a direct violation of the FLSA, specifically 29 U.S.C. § 207(a)(1).

216. Defendants' failure to pay proper overtime wages for each hour worked over forty (40) per week was willful within the meaning of 29 U.S.C. § 255(a).

217. Defendants' failure to comply with the FLSA caused Plaintiff to suffer a loss of wages.

218. Plaintiff is entitled to the maximum amount allowed under this statute.

**Second Cause of Action for Violation of Overtime Wage Provision Under the NYLL**

219. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if same were set forth herein fully at length.

220. Defendants employed Plaintiff within the meaning of NYLL §§ 2, 190, and 651.

221. Defendants failed to pay Plaintiff a premium for hours worked in excess of forty (40) hours per week, in violation of NYLL Art. 19 and N.Y. Comp. Codes R. and Regs. Tit. 12, § 142-2.2.

222. Defendants' failure to comply with the NYLL overtime requirements has caused Plaintiff to suffer loss of wages and interest thereon.

223. Defendants' failure to pay proper overtime wages is willful NYLL § 663.

224. Due to Defendants' NYLL violations, Plaintiff is entitled to recover from Defendants, jointly and severally, her unpaid overtime wages in an amount to be determined at trial, plus an amount equal to 100% of Plaintiff's unpaid overtime wages in the form of liquidated damages, as well as attorneys' fees and costs of the action, including pre- and post- judgment interest, pursuant to NYLL §§ 198 and 663(1).

**Third Cause of Action for Violation of Spread of hours Provisions Under the NYLL**

225. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if same were set forth herein fully at length.

226. Defendants employed Plaintiff within the meaning of NYLL §§ 2, 190, and 651.

227. Defendants failed to pay Plaintiff spread-of-hours wages, in violation of NYLL Art. 19 and N.Y. Comp. Codes R. and Regs. Tit. 12, § 142-2.4, which states that, "[a]n employee shall receive one hour's pay at the basic minimum wage rate in addition to the minimum wage required in this part for any day in which … the spread of hours exceeds 10 hours."

228. Defendants' failure to pay Plaintiff spread-of-hours wages was willful.

229. Due to Defendants' NYLL violations, Plaintiff is entitled to recover from Defendants damages in the amount of unpaid spread-of-hours wages and an amount equal to 100% of Plaintiff's unpaid spread-of-hour wages in the form of liquidated damages, as well as attorneys' fees and costs of the action, including pre- and post- judgment interest, pursuant to NYLL §§ 198 and 663(1).

**Fourth Cause of Action for Retaliation**
**Under the New York State Whistleblower Law**

230. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

231. New York State Whistleblower Law, New York Labor Law § 740 (2)(a)-(c), prohibits an employer from taking a retaliatory action against an employee because that employee:

> discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation or that the employee reasonably believes poses a substantial and specific danger to the public health or safety…or objects to, or refuses to participate in any such activity, policy or practice.

232. Defendants violated the section cited herein as set forth.

233. Plaintiff is entitled to the maximum amount allowed under this statute.

**Jury Demand**

234. Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiffs respectfully request a judgment against Defendants:

A. Declaring that Defendants engaged in unlawful employment practices prohibited by the FLSA and NYLL, for misclassification and failure to pay overtime wages and spread of hours;

B. Declaring that Defendants engaged in unlawful employment practices prohibited by the NYLL for retaliation against Plaintiff for participating in protected activities;

C. Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendants' unlawful conduct and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

D. Awarding Plaintiffs compensatory damages for mental and emotional injury, distress, pain, suffering, and injury to Plaintiffs' reputation in an amount to be proven;

E. Awarding Plaintiffs punitive damages;

F. Awarding Plaintiffs attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

G. Awarding Plaintiffs such other and further relief as the Court may deem equitable, just, and proper to remedy Defendants' unlawful employment practices.

Dated: July 15, 2025
New York, NY

**PHILLIPS & ASSOCIATES,**
**ATTORNEYS AT LAW, PLLC**

By: ______________________

Zachary Randall
*Attorneys for Plaintiff*
45 Broadway, 28th Floor
New York, New York 10006
(212) 248-7431
zrandall@tpglaws.com